

## NUMBER 13-19-00617-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

BENINO DELAGARZA A/K/A
BENINO DE LA GARZA,                                          Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

**On appeal from the 377th District Court
of Victoria County, Texas.**

## OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Opinion by Justice Silva**

Appellant Benino Delagarza a/k/a Benino De La Garza appeals his third-degree felony tampering with evidence conviction enhanced to a first-degree felony, for which he was sentenced to ninety-nine years' imprisonment. *See* TEX. PENAL CODE ANN. §§ 12.42(d), 37.09. By three issues, Delagarza argues (1) the trial court erred in denying

his motion to suppress; (2) the evidence was insufficient to support Delagarza's conviction; and (3) the trial court assessed a disproportionally unconstitutional sentence. *See* U.S. CONST. amends. IV, VIII, XIV; TEX. PENAL CODE ANN. § 37.09. We affirm.

## I.  BACKGROUND

### A.  Motion to Suppress

Delagarza was indicted for the offense of tampering with evidence, alleged to have occurred on or about March 12, 2019. The indictment alleged Delagarza, "knowing that an investigation was pending, namely a traffic stop, intentionally and knowingly conceal[ed] contraband, namely marijuana and methamphetamine, with intent to impair its availability as evidence in the investigation." *See* TEX. PENAL CODE ANN. § 37.09(a)(1). Delagarza subsequently filed a motion to suppress, challenging the search of his juvenile daughter, B.D., who was a passenger in his vehicle.

Three Victoria Police Department (VPD) officers testified at the suppression hearing. VPD officer Ryan Kelly testified that, on the evening of March 12, 2019, he was on patrol when he observed "what [he] believed to be a drug transaction" at a gas station. Kelly saw two vehicles parked "kind of close together" and witnessed a Hispanic male, later identified as Delagarza, "leaning into the vehicle that was at the gas pump." Kelly thereafter followed Delagarza's vehicle and initiated a traffic stop after observing a transportation code violation. Kelly testified that he detected marijuana residue on Delagarza's shirt and an odor of marijuana emanating from the vehicle upon initial contact. Kelly's in-car and body camera recordings were admitted into evidence at the hearing. Kelly can be seen instructing Delagarza to exit the vehicle, and a pat down of

2

Delagarza revealed Delagarza had over $1,500[1] in cash in his possession. Delagarza was then detained while the officers searched the vehicle and its occupants: Delagarza's two daughters, ages thirteen and fourteen, and Amy Magana, Delagarza's then-girlfriend.

Kelly and VPD officer Jonathan De La Rosa[2] testified that the females were not searched for officer safety but, rather, because officers suspected that a drug transaction had occurred and that they were hiding evidence. De La Rosa testified that one of Delagarza's daughters, B.D., behaved suspiciously; B.D. refused to step out of the vehicle, kept "wanting to cover up with her jacket," and complained about needing to use the restroom.

VPD officer Leticia Guajardo testified that Magana "seemed upset," but she was forthcoming and told Guajardo that "she had some contraband in her shorts, in her underwear, [and] private area." Guajardo testified that, unlike Magana, B.D. was not cooperative. B.D. declined to stand to be searched and asked to speak with her father first. After Guajardo instructed B.D. to remove the oversized jacket she was wearing, marijuana could be seen "hanging out from the top of her waistband on her pants . . . in plain view."

Delagarza asserted that B.D. had been unlawfully searched by law enforcement, and therefore, "[t]he marijuana found on [B.D.] is inadmissible and should not be admitted at trial." The State countered that Delagarza lacked standing to contest the search of his

---

[1] At trial, Kelly testified that the exact amount was $1,989.55.

[2] The reporter's record, clerk's record, and parties' briefs present alternative spellings for Officer Jonathan De La Rosa's name. We proceed with the spelling provided by De La Rosa at trial.

3

juvenile daughter. The trial court denied Delagarza's motion to suppress, and the case proceeded to trial.

**B.      Trial**[3]

**1.      Magana**

Magana testified she had known Delagarza for eight or nine years and had been in a relationship with him for "not even a month" at the time of the stop on March 12, 2019. Magana testified that, prior to the stop, Delagarza had driven to the gas station to buy "dro," a potent strain of marijuana, for his daughters who were also in the vehicle. Magana stated that Delagarza handed her a baggie of methamphetamine and marijuana "to hide," and she put the baggies of marijuana "inside" her vagina after officers initiated a traffic stop but before Delagarza stopped the vehicle. Magana did not specify where she hid the methamphetamine. According to Magana, Delagarza also gave a bag of marijuana to B.D., and "[s]he put it down her pants." Magana consented to the officer's search, and after initially taking responsibility, Magana stated that she had hid the drugs at Delagarza's direction. Several body camera recordings were admitted into evidence. Magana can be heard initially telling officers, "You can put everything on me."

During cross-examination, Magana was confronted with an affidavit she had written prior to trial, wherein she took full responsibility for the drugs found in her possession and swore she had previously lied to police. Jail phone call recordings were also admitted at trial,[4] wherein Magana can be heard telling Delagarza that she never

---

[3] The first trial, which began on November 5, 2019, resulted in a mistrial. The second trial began November 18, 2019.

[4] In one recording, Delagarza mentioned the weight of the methamphetamine found in Magana's

told officers that he had given her the drugs to hide: "You didn't hand it to me, and you didn't hand it to [B.D.] because you didn't have nothing on you. . . . What I had on my possession was mine. What [B.D.] had it [sic] on hers was hers."

On re-direct examination, Magana testified that she lied in the affidavit, and she had been pressured by Delagarza into making those phone call statements, knowing they would be recorded. Magana testified that she lied "[b]ecause [she] was in love,"[5] and at the time she executed the affidavit, she was living with Delagarza's mother and dependent on Delagarza.

### 2. Law Enforcement

Kelly and De La Rosa provided substantially the same testimony as they did at the suppression hearing. Kelly testified that the stop occurred at approximately 10:50 p.m., and he found it unusual that Delagarza did not immediately pull over. According to Kelly, the only marijuana located inside the vehicle was found in the driver's side door panel, inside a DVD case wrapped in a vehicle inspection receipt dated February 15, 2019. Kelly stated that Delagarza denied responsibility for the marijuana found.

In Kelly's body camera recording, Delagarza can be heard stating that he had "barely just got that car back running" because it had been sitting idle for "four years," so any drugs in the vehicle "could be some old shit." Delagarza also stated that Magana and his mother drove the vehicle on occasion. In response to the marijuana residue found all over his shirt, Delagarza stated he had been "rolling a joint for one of his friends." When

___

possession.

[5] Magana testified that, as a prior expression of her love, she had Delagarza's name tattooed on her body two weeks into their relationship.

asked whether he had any marijuana on him, Delagarza stated, "I had a little bit a while ago that I was going to roll but I lost it."

Kelly testified, that based on his "training and experience," males "give female counterparts narcotics . . . to hide on their person just because they know that male officers can't touch their breasts or their genital area when we search them," and "they kind of roll the dice hoping that a female officer won't be involved to conduct a more thorough search."

### 3. B.D.

B.D. testified that her father never told her to hide any drugs, and she never saw Delagarza hand Magana drugs to hide. B.D. testified she had been smoking marijuana earlier in the evening and maintained that Delagarza stopped at the gas station to "use the restroom and buy cigarettes"—not to purchase marijuana. B.D. said Magana gave her the bag of marijuana to hold while they were parked at the gas station, and B.D. "put it in [her] pants before [Delagarza] came back into the car."

On cross-examination, B.D. was questioned as to why she felt she had to hide the marijuana given to her by Magana "considering [she had] just smoked an entire blunt in front of [her] father." B.D. responded, "I don't know. I mean, my dad was talking outside. [Magana] came back in the car and asked me if I knew how to roll, and I said yeah. So she gave me more weed." B.D. was also asked about jail phone calls made before trial, wherein Delagarza told B.D. what Magana would be testifying to, B.D. expressed wanting to move in with Delagarza once he was no longer in custody, and Delagarza promised to let B.D. live with him.

6

## C.     Punishment

A jury found Delagarza guilty of tampering with evidence, and Delagarza elected to have the trial court determine punishment. Delagarza pleaded true to enhancement paragraphs alleging two prior convictions: unlawful delivery of a controlled substance, a first-degree felony from 2009 and felony assault involving family violence, a third-degree felony from 2015.

During punishment, the State introduced evidence of Delagarza's other prior arrests and fourteen judgments involving unrelated female complainants, which included: (1) an indictment on charges of aggravated robbery, aggravated kidnapping, aggravated assault, and retaliation; the related-judgment of conviction, wherein Delagarza pleaded guilty to one count of retaliation, the State dismissed the remaining counts, and Delagarza was sentenced to ten years' imprisonment in 2009; (2) a complaint on charges of terroristic threat, which resulted in a six-month jail sentence in 2001, and an agreement that the State would not indict Delagarza on a related state-jail felony charge of "tampering with a witness"; and (3) several misdemeanor drug, harassment, terroristic threat, and criminal trespass convictions.

Sara Hobbs, Delagarza's ex-girlfriend, also testified to facts concerning a prior conviction wherein she was the listed complainant. Hobbs testified that she and Delagarza dated for "about a year," during which she lost count of the number of times Delagarza had been physically abusive. Hobbs stated that, following one abusive incident, Delagarza left her hospitalized for two weeks in the intensive care unit. Photographs of Hobbs's injuries were admitted, and the images depict severe bruising

7

blanketing Hobbs's face, arms, legs, and backside; Hobbs's facial features are largely obscured due to the extensiveness of the injuries sustained. Hobbs testified that another incident, which occurred when she was eight months pregnant, resulted in the stillbirth of their child. Delagarza was indicted on charges of aggravated assault and assault family violence in connection with the assaults involving Hobbs. Delagarza pleaded guilty to one count of assault family violence; the State dismissed the remaining counts; and Delagarza was sentenced to six years' imprisonment in 2015.

Following the hearing, the trial court sentenced Delagarza to ninety-nine years' imprisonment. Delagarza did not object to the sentence, and there was no motion for new trial filed. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By his second issue, which we address first, Delagarza argues the evidence was insufficient to support his conviction.

### A.    Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence "in the light most favorable to the verdict" to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State* (*Stahmann II*), 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in

8

establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.*

Although the indictment charged Delagarza as a principal to the offense of tampering with evidence, the jury charge allowed the jury to convict Delagarza as a principal or as a party. *See In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) ("Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence."); *see generally Ramirez v.*

9

*State*, 621 S.W.3d 711, 722 (Tex. Crim. App. 2021). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01. Relevant here, "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). In determining whether a defendant is a party, the factfinder may rely on "events that took place before, during, or after the commission of the offense." *Cary v. State*, 507 S.W.3d 750, 758 (Tex. Crim. App. 2016); *Qualls v. State*, 547 S.W.3d 663, 673 (Tex. App.—Fort Worth 2018, pet. ref'd).

Therefore, a hypothetically correct charge would instruct the jury to find Delagarza guilty of tampering with physical evidence if the State proved beyond a reasonable doubt that (1) knowing that an investigation or official proceeding was pending or in progress, (2) Delagarza altered, destroyed, or concealed methamphetamine or marijuana, (3) with the intent to impair its verity or availability as evidence in the investigation or official proceeding, or (4) alternatively, Delagarza was criminally responsible as a party to the offense of tampering with physical evidence by soliciting, encouraging, directing, aiding, or attempting to aid another person, namely Magana or B.D., to commit the offense. TEX. PENAL CODE ANN. §§ 7.02(b), 37.09(a)(1); *Stahmann II*, 602 S.W.3d at 576.

"[I]ntent and concealment are two distinct elements of the offense." *Stahmann II*, 602 S.W.3d at 581. "A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." TEX.

PENAL CODE ANN. § 6.03(a). "Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Stahmann v. State* (*Stahmann I*), 548 S.W.3d 46, 59 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). "Actual concealment requires a showing that the allegedly concealed item was hidden, removed from sight or notice, or kept from discovery or observation." *Id.* at 57.

## B.    Analysis

Neither party disputes that the act of concealing contraband underneath a person's undergarments or inside genitals, knowing that an investigation was in process, would constitute tampering with evidence. *See* TEX. PENAL CODE ANN. § 37.09; *see also Manifold v. State*, No. 06-17-00103-CR, 2017 WL 5180289, at *4 (Tex. App.—Texarkana Nov. 9, 2017, pet. ref'd) (mem. op., not designated for publication) (affirming a tampering conviction where the evidence showed that appellant possessed drugs at the time of the traffic stop and concealed the drugs "first in the front of his pants, and later in his anus, while sitting in the back seat of the patrol car"). Instead, Delagarza disputes that there was sufficient evidence to show that the drugs were concealed by Magana or B.D. at his direction.

Delagarza argues that the evidence at trial was exculpatory: there was no evidence indicating he was aware of any contraband found in the vehicle; B.D. testified that the marijuana she had hidden in her pants had been given to her by Magana at the gas station—unbeknownst to Delagarza; and Magana took responsibility for the drugs she hid in her initial statements to officers, signed affidavit, and jail phone call recordings.

11

However, the jury could have disbelieved B.D.'s testimony for any reason, including because B.D.'s statement that Magana gave her marijuana to hide from her father at the gas station was incongruous with B.D.'s testimony that Delagarza knew she smoked marijuana and she had previously smoked marijuana in his presence. Further, B.D. was motivated to be untruthful because Delagarza had promised her that she could live with him if he was released from custody. *See Sifuentes v. State*, 615 S.W.3d 914, 919 (Tex. Crim. App. 2021) (providing that "[a]s the sole factfinders, the jurors were the exclusive judges of the credibility of the witnesses" and were free to disbelieve testimony and resolve conflicts in testimony). Additionally, Magana's initial claim of responsibility was couched in language which did not absolve Delagarza; Magana stated, "You can put everything on me"—she did not state that the drugs belonged to her, and when pressed who had given her and B.D. the drugs, Magana admitted to police that it had been Delagarza. Although Magana submitted a signed affidavit, wherein she claimed responsibility for the drugs and swore she concealed them on her own accord, Magana testified at trial that she lied in her affidavit and during jail calls because she was "in love" and dependent on Delagarza at the time. The jury was free to believe Magana's testimony at trial over her prior conflicting statements. *See id.*; *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

Further, Delagarza's intent to assist in the concealment of the contraband can be reasonably inferred in consideration of the cumulative force of all the evidence presented at trial. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)

12

("[C]ircumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."). In addition to B.D.'s and Magana's testimony, the jury may have considered the following evidence: (1) law enforcement observed a drug transaction involving Delagarza and an unknown male at the gas station prior to the traffic stop; (2) Delagarza did not immediately pull over his vehicle once officers initiated pursuit; (3) Delagarza inexplicably had more than $1,900 in cash in his possession; (4) Delagarza had marijuana residue on his shirt, which he acknowledged although he claimed it belonged to a friend; (5) though Delagarza disclaimed knowledge of the marijuana found inside a DVD in the driver's side door, Delagarza's statement that the marijuana had to have been old because the car had been unused for years was in contravention to the printed receipt used to wrap the marijuana, which was dated a month before the stop; (6) Officer Kelly testified, based on his training and experience, that male drug traffickers often use women to hide contraband in hopes of evading an intrusive physical search; and (7) jail call recordings revealed Delagarza knew the precise weight of the methamphetamine contraband confiscated. *See id.*

Applying the appropriate level of deference to the jury's verdict, we conclude there is sufficient evidence to support Delagarza's conviction as a principal or a party to this offense. We overrule Delagarza's second issue.

### III.    MOTION TO SUPPRESS

By his first issue, Delagarza asserts his juvenile daughter was unlawfully searched without a warrant or consent, rendering the marijuana seized inadmissible evidence. *See*

13

U.S. CONST. amend. IV. The State argues Delagarza lacks standing to challenge the lawfulness of B.D.'s search. We agree with the State.

## A. Standard of Review

"We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor." *Wells v. State*, 611 S.W.3d 396, 405 (Tex. Crim. App. 2020) (quoting *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)). Mixed questions of law and facts that do not hinge on assessments of credibility or demeanor are reviewed de novo. *Id.* at 405–06. We will sustain the trial court's ruling if the ruling is correct under any applicable theory of law. *Id.*

## B. Applicable Law

To prevail on an alleged violation of the Fourth Amendment of the United States Constitution, a defendant must first establish his standing to challenge the admission of the evidence obtained. *See State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013); *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004). At the outset, as the parties both acknowledge in their respective briefs, we note that this case presents an issue of first impression for this Court: whether a parent, during the parent's criminal proceeding, has standing to challenge a related warrantless non-consensual search of their minor child which occurred in their presence. *See* U.S. CONST. amend. IV.

"The Fourth Amendment provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall

14

not be violated.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting U.S. CONST. amend. IV). "More recently, the [United States Supreme] Court has recognized that 'property rights are not the sole measure of Fourth Amendment violations.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)); *see Katz v. United States*, 389 U.S. 347, 351 (1967) (establishing "the Fourth Amendment protects people, not places"); *see, e.g.*, *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016) ("Intrusions into the human body implicate an individual's 'most personal and deep-rooted expectations of privacy,' and therefore are considered searches that fall under the Fourth Amendment's warrant requirement." (quoting *Missouri v. McNeely*, 569 U.S. 141, 148 (2013))). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 99 (1979); *see Parker v. State*, 182 S.W.3d 923, 925–26 (Tex. Crim. App. 2006). Fourth Amendment protections extend to children as well. *New Jersey v. T.L.O.*, 469 U.S. 325, 337–38 (1985) ("A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy."); *In re S.C.*, 523 S.W.3d 279, 285 (Tex. App.—San Antonio 2017, pet. denied) ("Like an adult, a juvenile is protected from an unreasonable search by the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution.").

Moreover, it has long been accepted that "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure[.]" *Rakas v. Illinois*, 439 U.S. 128, 138 (1978) (quoting *Simmons v. United States*, 390 U.S. 377, 389 (1968)); *Matthews v. State*, 431 S.W.3d 596, 606 (Tex. Crim. App. 2014) ("[A]n accused must show that the search violated *his,* rather than a third party's, legitimate expectation of privacy."). Therefore, a defendant claiming a Fourth Amendment violation, "must show that he personally had a reasonable expectation of privacy that the government violated" before a Fourth Amendment violation analysis may be resolved in his favor. *State v. Elrod*, 395 S.W.3d 869, 877 (Tex. App.—Austin 2013, no pet.). "Th[is] 'standing' doctrine ensures that a person may claim only that his own rights have been violated; he cannot assert that he is entitled to benefit because the rights of another have been violated." *State v. Granville*, 423 S.W.3d 399, 405 (Tex. Crim. App. 2014).

## C. Analysis

Delagarza directs this court to *In re S.C.* and § 151.001 of the Texas Family Code in support of his proposition that a parent may challenge the purported violation of his minor child's constitutional rights in the parent's criminal proceeding. *See* TEX. FAM. CODE. ANN. § 151.001 (rights and duties of a parent); *In re S.C.*, 523 S.W.3d at 286. Delagarza argues that our sister court in *In re S.C.* recognized the parent's "right . . . to make . . . decisions of substantial legal significance concerning the child" in a criminal

16

proceeding, and that this Court should follow suit. 523 S.W.3d at 286 (quoting TEX. FAM. CODE. ANN. § 151.001(a)(2), (7)). We find *In re S.C.* to be inapplicable.

In *In re S.C.*, officers were investigating the suspected involvement of S.C., a child, in a burglary. *Id.* at 281. Officers requested consent from S.C.'s mother to enter the home, and she declined. *Id.* at 282. Afterward, officers separately spoke with S.C., who confessed to his involvement and agreed to show officers where the stolen property was being kept inside the home. *Id.* S.C. was arrested and subsequently filed a motion to suppress the oral statements he made to officers. *Id.* The San Antonio court determined that S.C. was not in custody at the time he made the statements and then shifted its analysis to consider whether the entry to the home was reasonable given the "disputed consent." *Id.* at 284–85. The court ultimately held that "it is generally unreasonable for an officer to rely on a minor child's consent to search a home when the child's parent is present and has objected to the search." *Id.* at 287. Here, neither party disputes that B.D. declined to provide consent for the officer to search, and Delagarza was never asked for his consent. In any event, the *In re S.C.* court did not address the issue of standing. *See id.* Thus, it has no bearing on the issue we are tasked with determining here—namely, whether Delagarza, as the parent of B.D., may assert a Fourth Amendment violation on behalf of B.D. in his own criminal proceeding. For reasons set forth below, we conclude that he cannot.

We acknowledge that a parent, in many contexts, has a right to make decisions of substantial legal significance concerning their child.

> [O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents

17

> generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.

*Troxel v. Granville*, 530 U.S. 57, 68 (2000) (quoting *Parham v. J. R.*, 442 U.S. 584, 602 (1979)) (cleaned up); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985) ("The natural right existing between parents and their children is of constitutional dimensions."). Equally established is that "while parental rights are of a constitutional magnitude, they are not absolute." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Delagarza sweeps too broadly in his attempt to coalesce a parent's fundamental interest in decisions concerning the care, custody, and control over their child with an individual's constitutional right to be free against unreasonable searches and seizures by transferring rights to a parent which already appropriately belong to their child. *See T.L.O.*, 469 U.S. at 337–38; *Granville*, 423 S.W.3d at 405.

Our country's jurisprudence concerning Fourth Amendment protections is clear: where a defendant claims an infringement of a Fourth Amendment right, at issue must be an infringement of his own right—not the inalienable right of another. *See Rakas*, 439 U.S. at 138; *Kothe*, 152 S.W.3d at 59; *see also Pham v. State*, 324 S.W.3d 869, 876–77 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (concluding that neither the Fourth Amendment nor article 38.23(a) confer third-party standing to persons accused of crimes, such that they may complain "about the receipt of evidence that was obtained by violation of the rights of others, no matter how remote an interest from themselves"); *Martinez v. State*, 236 S.W.3d 361, 367–68 (Tex. App.—Fort Worth 2007, pet. ref'd, untimely filed)

(observing in dicta that a defendant has no standing to challenge a search of his juvenile son). We decline to carve an exception to this long-standing legal principle so that a parent may claim a Fourth Amendment violation on behalf of their child in the parent's criminal proceeding—an exception which would not only frustrate existing Fourth Amendment precedent but create significant policy implications.

Because standing is a prerequisite for a Fourth Amendment violation analysis, and Delagarza has not shown standing, we overrule Delagarza's first issue without making the determination of whether the search of B.D. was lawful. *See Kothe*, 152 S.W.3d at 59 ("Only after a defendant has established his standing to complain may a court consider whether he has suffered a substantive Fourth Amendment violation."). We overrule Delagarza's first issue.

## IV. EXCESSIVE PUNISHMENT

In his third issue, Delagarza contends that his ninety-nine-year sentence is excessive and in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *See* U.S. CONST. amends. VIII, XIV.

An allegation of excessive or disproportionate punishment is a legal claim "embodied in the Constitution's ban on cruel and unusual punishment" and based on a "narrow principle that does not require strict proportionality between the crime and the sentence." *State v. Simpson*, 488 S.W.3d 318, 322–24 (Tex. Crim. App. 2016) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); *see* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *see also Meadoux v. State*, 325 S.W.3d

19

189, 193 (Tex. Crim. App. 2010) (acknowledging that the Eighth Amendment is applicable to the states by virtue of the Fourteenth Amendment (citing *Robinson v. California,* 370 U.S. 660, 666–67 (1962))). A successful challenge to proportionality is exceedingly rare and requires a finding of "gross disproportionality." *Simpson*, 488 S.W.3d at 322–23 (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)); *Trevino v. State*, 174 S.W.3d 925, 928 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd).

However, in order to preserve for appellate review a complaint that a sentence is grossly disproportionate or cruel and unusual, a defendant must present to the trial court a "timely request, objection, or motion" stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a); *see Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986) ("It is well settled that almost every right, constitutional and statutory, may be waived by the failure to object."); *Toledo v. State*, 519 S.W.3d 273, 284 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (concluding that to preserve a disproportionate-sentencing complaint, the defendant must make a timely, specific objection in trial court or raise the issue in a motion for new trial); *see also Brackens v. State*, No. 13-20-00286-CR, 2021 WL 1567508, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 22, 2021, pet. ref'd) (mem. op., not designated for publication) (same).

At no time prior to this appeal did Delagarza argue that the sentence imposed was disproportionate to the offense charged or in violation of his constitutional rights. Accordingly, Delagarza failed to preserve his complaint for review. *See* TEX. R. APP. P. 33.1(a); *Smith*, 721 S.W.2d at 855; *Trevino*, 174 S.W.3d at 927–28; *see also Nieves-Perez v. State*, No. 12-19-00389-CR, 2021 WL 1047209, at *3 (Tex. App.—Tyler Mar. 18,

2021, pet. ref'd) (mem. op., not designated for publication) (affirming a life sentence for a conviction for engaging in organized criminal activity for credit card skimming where the appellant failed to preserve the issue of disproportionality for review and the sentence fell within the statutory punishment range); *Johnson v. State*, No. 13-15-00420-CR, 2016 WL 3911231, at *2 (Tex. App.—Corpus Christi–Edinburg July 14, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding the appellant waived any error in his sentence of seventy years' imprisonment for DWI "by failing to object when he had the opportunity to do so").

We overrule Delagarza's third issue.

### V. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
14th day of October, 2021.

21